**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ALEXANDRA K. CONRAD, | ) | CASE NO. 1:25-CV-601 |
| | ) | |
| Plaintiff, | ) | JUDGE DAVID A. RUIZ |
| | ) | UNITED STATES DISTRICT JUDGE |
| v. | ) | |
| | ) | MAGISTATE JUDGE |
| COMMISSIONER OF SOCIAL | ) | JENNIFER DOWDELL ARMSTRONG |
| SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

## I.  INTRODUCTION

The Commissioner of Social Security[1] denied Plaintiff Alexandra K. Conrad's application for a period of disability, Supplemental Security Income (SSI), and Disability Insurance Benefits (DIB). Ms. Conrad seeks judicial review of that decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c). (Compl., ECF No. 1.) This matter is before me pursuant to Local Rule 72.2(b). (*See* ECF non-document entry dated March 26, 2025.)

For the reasons set forth below, I RECOMMEND that the Court AFFIRM the Commissioner's decision.

## II.  PROCEDURAL HISTORY

In February 2022, Ms. Conrad applied to the Social Security Administration (SSA) seeking period of disability, SSI, and DIB benefits; she claimed that she became blind and disabled on September 1, 2019. (Tr. 220, 227.)[2] She identified six allegedly disabling conditions:

---

[1] Leland Dudek was serving as Acting Commissioner of Social Security when the complaint was filed. He served in that role until May 2025, when Frank Bisignano, the current Commissioner, was confirmed.

[2] The administrative transcript appears at ECF No. 7. I will refer to pages within that transcript by identifying the Bates number printed on the bottom right-hand corner of the page (e.g., "Tr. 31"). I will refer to other documents in the record by their CM/ECF document numbers (e.g., "ECF No. 9") and page-identification numbers (e.g., "PageID# 1164").

(1) neurofibromatosis type 1; (2) optic nerve glioma in right eye; (3) "tumors in brain, spine and leg"; (4) depression; (5) generalized anxiety; and (6) post-traumatic stress disorder. (Tr. 275.)

The SSA denied Ms. Conrad's application initially and upon reconsideration. (Tr. 80, 90, 92, 102, 111, 113–14, 122.) Ms. Conrad requested a hearing before an administrative law judge (ALJ). (Tr. 124, 147.) She wrote that she cannot work "due to my body aches, severe migrain[e]s [and] my tumors." (*Id.*) Ms. Conrad's counsel submitted a brief in advance of the hearing. (Tr. 347–51.) The ALJ held a hearing on November 1, 2023, at which Ms. Conrad was represented by counsel. (Tr. 38–60.) Ms. Conrad testified, as did an independent vocational expert (VE). (*Id.*)

On February 27, 2024, the ALJ issued a written decision finding that Ms. Conrad is not disabled. (Tr. 14–31.)

Ms. Conrad requested review of the ALJ's decision. (Tr. 216.) Her counsel submitted a brief identifying alleged errors in the decision. (Tr. 353–55.) On January 28, 2025, the Appeals Council denied review, rendering the ALJ's decision final. (Tr. 1.)

On March 26, 2025, Ms. Conrad filed her Complaint, challenging the Commissioner's final decision that she is not disabled. (ECF No. 1.) Ms. Conrad asserts the following assignments of error for review:

> **First Assignment of Error:** The ALJ failed to evaluate the persuasiveness of Plaintiff's symptoms pursuant to SSR 16-3p.
>
> **Second Assignment of Error:** The ALJ failed to identify substantial evidence supporting the RFC finding and failed to evaluate the medical opinions pursuant to the regulations.

(Pl.'s Merit Br. at 11, 21, ECF No. 9, PageID# 1164, 1174.)

III.     **BACKGROUND**[3]

A.     **Prior Application**

Ms. Conrad previously filed an application for disability benefits in October 2011; the application was denied after a hearing in June 2013. (Tr. 61–74.) The record does not reflect that Ms. Conrad sought further review of that decision.

B.     **Personal, Educational, and Vocational Experience**

Ms. Conrad was born in February 1989 and was 30 years old on the date of her application. (Tr. 220.) She graduated high school.[4] (Tr. 43, 276.) She has never held a driver's license. (Tr. 44.) She previously worked for Richland County as a state tested nursing assistant ("STNA"). (Tr. 45.) In that position, she helped care for patients by cleaning rooms and assisting patients with showers and meals. (*Id.*) She previously worked at another institution while she obtained her STNA credential, helping in the kitchen, doing laundry, and assisting patients by lifting, rolling, and helping them shower. (Tr. 46–47.) Before that, she worked cleaning rest areas. (*Id.*) She also has limited experience doing assembly work. (Tr. 49; *see also* Tr. 260.)

---

[3] During the administrative proceedings, Ms. Conrad alleged that she was disabled as a result of both physical and mental conditions. In this proceeding, she challenges the ALJ's analysis only with respect to her physical conditions. I therefore focus my summary on the evidence relevant to her physical health conditions and limitations.

[4] The record contains numerous educational records, which are not summarized herein as the parties do not rely on those records in support of their arguments in the matter. (Tr. 357–93.) The record also contains numerous mental-health counseling notes, which are not summarized here except to the extent relevant to the arguments presented. (*See, e.g.*, Tr. 493, 502, 511, 520, 674, 825, 836, 843, 853, 865, 867, 869, 871, 873, 875, 877, 879, 881, 883, 885, 887, 889, 891, 893, 895, 897, 899, 901, 903, 905, 907, 909, 911, 913, 915, 917, 946, 948, 951, 954, 959, 962, 964, 968, 970, 972, 974, 976, 978, 980, 983, 986, 991, 993, 995, 998, 1000, 1002, 1006, 1008, 1010, 1012, 1014, 1016, 1018, 1020, 1023, 1025, 1027, 1029, 1031, 1033,1035, 1037, 1039, 1041, 1043, 1045.)

C.  **Function Report**

In March 2022, Ms. Conrad reported that her condition had worsened in that she was experiencing a sharp, stabbing pain in her left knee. (Tr. 253.) She said she had changed jobs to avoid strenuous activity, walking, and lifting due to her physical pain. (Tr. 258.)

Ms. Conrad completed a function report in April 2022. (Tr. 285–292.) She stated that she lives alone in an apartment. (Tr. 285.) She has chronic pains that have been making it hard for her to move and stand. (*Id.*) She has tumors on her spine and brain. (*Id.*) She has anxiety and "other mental issues." (*Id.*)

She described that, on an average day, she wakes up, uses the restroom, feeds her cat and then herself, and then stays home; she occupies her time by reading or looking for a hobby. (Tr. 286.)

Ms. Conrad is able to care for her cat by feeding him and cleaning his litter box. (*Id.*) She has no trouble feeding herself or using the restroom. (*Id.*) Lately, her cooking has been limited to pre-made or very easy meals because she does not have the strength or energy to cook, and her pain makes it hard to stay motivated or stand at the stove. (Tr. 287.)

Ms. Conrad does not need reminders to take care of her personal needs or grooming, or to take medicine. (Tr. 287.) She has trouble sleeping, and sleep is "impossible" when she has an "extra bad" pain flare-up. (Tr. 286.) She finds herself taking frequent baths, as that helps with her pain. (*Id.*) She chooses softer clothing, which is more comfortable for her conditions. (*Id.*)

Ms. Conrad is able to do laundry, but doing so takes her a full day. (Tr. 287.) She is able to do dishes, but doing so can take several days. (*Id.*) She needs "a lot of encouragement" to complete her household tasks. (*Id.*) She cannot lift a lot of weight and has trouble squatting, bending, standing for long periods of time, and walking. (Tr. 290.)

4

Ms. Conrad rarely goes out. (Tr. 288.) When she does make it out, she is in pain when she gets home. (*Id.*) She tried driving, but it "became too much"; she was frightened and felt unsafe because she cannot see out of her right eye. (*Id.*) She does shop for food and cat supplies, but doing so takes a long time and wears her out. (*Id.*) She is unable to focus or concentrate "due to tumors and worry." (Tr. 290.)

Ms. Conrad enjoys watching television, reading, listening to music, and writing letters, although with the pain it now takes her longer to write than it used to. (Tr. 289.) She sometimes has trouble even sitting and concentrating on a television program. (*Id.*) Ms. Conrad interacts with others through the mail and through "video chat"; she goes out once a week to the library (often with her mother) to get books and movies. (*Id.*) She said she has "no social life" and sometimes does not get along with family members. (*Id.*)

In January 2023, Ms. Conrad reported that her quality of life had "diminished" because of her pelvic pains, migraines, anxiety, "lack of social activities due to severe pain," difficulty completing household tasks, having to depend on others to get around, and losing interest in the things she used to enjoy. (Tr. 310.)

### D.  <u>Relevant Hearing Testimony</u>

#### *1.  Ms. Conrad's Testimony*

Ms. Conrad testified that she was working 20 hours per week for a public library. (Tr. 44.) She worked in the circulation department, checking books in and out and inspecting them for damage. (*Id.*) She sometimes works four-hour shifts and sometimes eight-hour shifts. (Tr. 45.)

Ms. Conrad has neurofibromatosis, and she described that she has external tumors "[a]ll over" her body. (Tr. 49.) She has a large tumor on her left wrist and a lesion on her forearm. (*Id.*) She discovers new tumors daily. (*Id.*) She also has internal tumors. (Tr. 50.)

From 2019 onward, Ms. Conrad began experiencing debilitating pelvic pain. (*Id.*) Sometimes the pain is so severe as to leave her "on the floor." (*Id.*) Her doctors have searched for a cause, without success. (*Id.*)

Ms. Conrad is blind in her right eye. (*Id.*) She described that she has general pain throughout her entire body. (*Id.*) She takes medicine for pain, including venlafaxine (an SNRI) and Abstral (an opioid). (*See* Tr. 51.) Sometimes these medicines help, and sometimes they do not. (*Id.*)

Ms. Conrad further testified that she attends counseling to help with anxiety and depression. (*Id.*) Many times, she does not want to leave her house, and she often worries that she will have a pain flare-up if she goes out. (*Id.*) She does not take medication for any mental health condition. Ms. Conrad attends counseling in-person around once per week. (Tr. 53.)

Ms. Conrad is currently working around three days per week at a library, totaling around 20 hours per week. (Tr. 53.) She either gets a ride to work, or she walks; the workplace is only two blocks from her home. (*Id.*)

Ms. Conrad testified that she had been working full-time until the date of alleged onset of disability, after which she went down to part-time work because of her conditions. (Tr. 52.) She has continued working part-time in the years since that date, but when she gets home she often is in pain—sometimes significant enough that she cannot prepare a meal for herself or see to her other tasks in the home. (*Id.*)

When she has a pain flare-up, Ms. Conrad will take medicine if she is at work. (Tr. 53.) If she is at home, she will usually take the medicine, take a bath, and then "crawl into bed." (*Id.*)

### 2. *Vocational Expert's Testimony*

Melissa Hall testified as a vocation expert (VE) at the hearing. (Tr. 54.)

The ALJ asked the VE to assume that an individual with Ms. Conrad's age, education, and experience had the ability to perform light work, except that the person could not climb ladders, ropes, and scaffolds and should avoid unprotected heights. (Tr. 55.) The person would be further limited in that they are only capable of work that involves understanding, remembering, and following simple instructions and directions in a static work environment, with no requirement for binocular vision. (Tr. 56.) The person would be further limited in that they could tolerate only occasional, superficial contact with the public. (*Id.*)

The VE opined that such an individual could not perform any of Ms. Conrad's past relevant work but could perform the work of a "marker" (DOT 209.587-034), "routing clerk" (DOT 222.687-022), or "router" (DOT 222.587-038). (Tr. 56.)

The ALJ next asked the VE to further limit the hypothetical individual. In addition to the limitations from the first hypothetical, the individual could frequently climb ramps and stairs, stoop, kneel, and crouch, and only occasionally crawl. (Tr. 56–57.) The person should avoid hazards including moving machinery and heavy machinery, and should avoid commercial driving. (Tr. 57.) The person could tolerate simple, routine tasks with occasional interaction with coworkers, supervisors, and the public, as well as occasional changes and occasional decision making in a routine work setting. (*Id.*) The person would be off task for up to five percent of the workday. (*Id.*)

The VE testified that such a person could not perform any of Ms. Conrad's past relevant work but could perform any of the three jobs previously cited in response to the first hypothetical. (*Id.*)

The ALJ next asked the VE to assume that the person from the second hypothetical would be further limited in that they would be off task for more than 15 percent of the workday and would be absent from work for two or more days per month. (*Id.*) The VE testified that no competitive employment would be available to a person so limited. (*Id.*)

### E.     State Agency Consultants

A disability examiner (Joseph Majernik), a physician (Dr. Gerald Klyop), and a psychologist (Karla Delcour) reviewed Ms. Conrad's claim at the initial review level. (Tr. 80–91.) Dr. Delcour opined that Ms. Conrad's mental health conditions were not severe, reasoning that she had only mild impairments with respect to her ability to interact with others and to adapt and manage herself. (Tr. 85–86.)

Dr. Klyop opined that Ms. Conrad's physical conditions could be expected to produce the pain and other symptoms that she identified but concluded that her description of the extent of her limitations was only partially consistent with the record evidence. (Tr. 87.) Dr. Klyop noted Ms. Conrad's diagnoses of neurofibromatosis, right eye blindness from an optic nerve glioma, and pelvic floor myalgias. (*Id.*) But he pointed out that examinations revealed that her sensation to light touch was intact in all extremities, that she ambulates without an abnormal posture or gait, that she had a negative Romberg test, and that a brain MRI showed no "acute infarct, hemorrhage, or mass effect." (*Id.*) He further noted that the enhancing lesion found in the right ileus psoas musculature "has a benign appearance and is most consistent with an intramuscular myxoma or peripheral nerve sheath tumor," with no findings typical of malignancy. (*Id.*)

Dr. Klyop opined that Ms. Conrad could frequently lift and carry items up to 10 pounds, and occasionally do so for objects up to 20 pounds; her ability to push and pull was otherwise unlimited. (Tr. 88.) She could stand and walk for six hours and sit for six hours out of an eight-hour workday. (*Id.*) She should never climb ladders, ropes, or scaffolds, but could frequently climb

ramps and stairs, stoop, kneel, and crouch. (*Id.*) She could occasionally crawl. (*Id.*) Her ability to balance was not limited. (*Id.*) She could perform no work requiring binocular vision. (*Id.*) She should avoid all exposure to heavy moving machinery, unprotected heights, and commercial driving, but otherwise had no environmental limitations. (Tr. 89.)

The agency consultants determined that Ms. Conrad retained the ability to perform light work, such as that required of a "band salvager" (DOT 929.686-014), "label remover" (DOT 920.687-106), or "folding-machine feeder" (DOT 920.686-018). (Tr. 90.) They therefore found that Ms. Conrad was not disabled. (*Id.*)

In a letter to Ms. Conrad explaining its decision, the Agency wrote that, while Ms. Conrad had a history of medical treatment for her conditions and may "feel discomfort," her ability to move about was not significantly limited and she remained able to "do some light lifting." (Tr. 130.)

A physician (Venkatachala Sreenivas, M.D.), disability examiner (Heather Coey), and psychologist (Matthew Wong, Ph.D.) reviewed Ms. Conrad's claim at the reconsideration level. (Tr. 104–13.) Dr. Wong affirmed that the initial determination that Ms. Conrad's mental conditions were not severe was consistent with and supported by the medical evidence. (Tr. 107.) He further explained that the evidence indicates that her symptoms result in "no more than minimal limits in the ability to function independently, effectively, and appropriately on a sustained basis." (*Id.*) He noted that the consulting examination found that she performed well on concentration tasks. (*Id.*)

Dr. Sreenivas also affirmed the prior administrative medical findings and residual functional capacity, concluding that they were consistent with and supported by the medical evidence. (Tr. 110.)

Based on these conclusions, the agency consultants found that Ms. Conrad could perform light work, such as that required of a "furniture rental consultant" (DOT 295.357-018), "usher" (344.677-014), or "children's attendant" (DOT 349.677-018). (Tr. 111.) The consultants found that Ms. Conrad was therefore not disabled. (*Id.*)

In a letter to Ms. Conrad explaining this decision, the Agency wrote that her condition is "indeed severe" and acknowledged that she had "undergone much testing and treatment" for it, but the Agency concluded that "despite your significant limitations, your condition does not meet our program guidelines for disability benefits at this time." (Tr. 142.)

### F. <u>Relevant Medical Evidence</u>

Ms. Conrad started treatment with Emily Bowman, a certified nurse practitioner, on February 21, 2019. (Tr. 401.) Ms. Bowman noted that Ms. Conrad had seen a primary care provider one year prior, but that Ms. Conrad said that she had only went to the doctor for acute illnesses. (*Id.*) Ms. Conrad complained to Ms. Bowman of an episode of dizziness and ongoing fatigue. (*Id.*) Ms. Bowman noted that Ms. Conrad had previously been prescribed medication for her mental health conditions but "stopped it on her own a couple years ago," despite the fact that she felt the medication had been helping. (*Id.*) Ms. Conrad said she was working the night shift consistently. (*Id.*) Ms. Bowman ordered lab work. (Tr. 403–04.)

Ms. Conrad followed up with Ms. Bowman on March 1, 2019. (Tr. 411.) Ms. Conrad reported that she was hoping to cut back on her work hours to limit stress "and dealing with other individuals at work." (*Id.*) Ms. Conrad expressed an interest in counseling. (*Id.*) A physical examination was normal except that Ms. Bowman noted the right-eye blindness (a finding that remains consistent in future notes, but which I will not repeat in this document). (Tr. 412.) Ms. Bowman referred Ms. Conrad for counseling and recommended that she engage in regular exercise. (*Id.*) She noted that Ms. Conrad's dizziness had resolved. (*Id.*)

10

Ms. Conrad followed up with Ms. Bowman on April 1, 2019. (Tr. 424.) Ms. Conrad had not started counseling but had filled out intake paperwork at an agency. (*Id.*) Ms. Conrad described continued work stress and said she was looking for a new job. (*Id.*) Ms. Bowman encouraged Ms. Conrad to call the agency today to schedule counseling. (Tr. 426.)

Later that day, Ms. Conrad presented to a hospital emergency room complaining of pain in her right wrist and hip for the past week and a half. (Tr. 417–18.) She said she had been having pain for two years, which she believed to be work related, and she said she had filed a claim for workers' compensation. (*Id.*) Ms. Conrad also endorsed "some lower pelvic pain," which she described as "cramping." (*Id.*) A physical examination was largely normal, although Ms. Conrad had "some slight tender[ness] on palpation" of the suprapubic area (without guarding, rebound, rigidity, or masses). (Tr. 420–21.) Ms. Conrad also complained of tenderness on palpation to the distal radius and ulna, although she had full range of motion in the wrist and fingers. (*Id.*) Ms. Conrad had some tenderness on palpation of the right sacroiliac joint and the lateral aspect of the right hip, although she had full range of motion at the hip and knee. (Tr. 421.) X-ray imaging of the wrist and hip were negative for any acute abnormalities. (Tr. 422.) Ms. Conrad was prescribed a nonsteroidal anti-inflammatory drug (NSAID) and was given a wrist splint. (*Id.*)

Ms. Conrad consulted with Joseph Bocka, M.D., on July 2, 2019, for a prescription refill regarding pelvic pain. (Tr. 432.) Dr. Bocka noted that Ms. Conrad had seen another provider in April 2019 and was supposed to have undergone an exploratory laparoscopic procedure "for probable endometriosis"; she had been set for that procedure "but had some delays." (*Id.*) She was currently scheduled to undergo a "scoping" procedure on July 17, 2019. (*Id.*) Ms. Conrad said she had been prescribed Vicodin in May 2019 but had run out two days ago. (*Id.*) Ms. Conrad described "waves" of low abdominal pain lasting seconds to minutes, which the Vicodin had been helping.

(*Id.*) On physical examination, Ms. Conrad was not in current pain and was ambulating without difficulty. (Tr. 433.) Dr. Bocka refilled her prescriptions and prescribed her a medication for stomach pain and cramps. (Tr. 434.)

Ms. Conrad followed up with Ms. Bowman on July 24, 2019. (Tr. 436.) Ms. Conrad said she had an upcoming consultation with another provider on July 29, 2025, for pelvic pain. (*Id.*) She rated her pelvic pain as a five on a scale of ten. (*Id.*) She said it exacerbates without aggravating factors. (*Id.*) Ms. Conrad reported that a recent urinary ultrasound and scope were normal. (*Id.*) On physical examination, there was no tenderness to the abdomen on palpation. (Tr. 438.)

Ms. Conrad followed up with Ms. Bowman on October 14, 2019. (Tr. 443.) Ms. Bowman noted that Ms. Conrad had recently been seen for pelvic pain in an emergency department. (*Id.*) Ms. Bowman noted that a computed tomography scan on October 10, 2019, showed no evidence of intussusception or obstruction. (*Id.*) She further noted that Ms. Conrad had undergone a laparoscopic procedure on September 3, 2019, and had started birth control one week ago. (*Id.*) Ms. Conrad reported that the pain occurs in her pelvic area and said it had been better since her hospital treatment; she was able to work all weekend. (*Id.*) She noted improvement with warm baths and with the use of a heating pad. (*Id.*) A physical examination was normal. (Tr. 445.) Ms. Bowman referred Ms. Conrad to a gastroenterologist for continued investigation into the cause of her abdominal pain. (Tr. 446.)

Ms. Conrad consulted with gastroenterologist Ravindra Malhotra, MD, on October 24, 2019. (Tr. 440.) Ms. Conrad described that she had experienced lower abdominal pain "off and on" for two years. (*Id.*) A physical examination was normal. (Tr. 441.) Dr. Malhotra noted that Ms. Conrad "probably has IBS" and recommended a high fiber diet and continued use of dicyclomine hydrochloride. (*Id.*)

12

Ms. Conrad consulted with Cara King, D.O., on December 12, 2019, describing pelvic pain over the preceding two years. (Tr. 458.) Ms. Conrad said that the pain was "so severe it doubles her over" and identified that it is intermittent. (*Id.*) Ms. Conrad denied abdominal pain at the appointment but was positive for pelvic tenderness on examination. (Tr. 460.) Dr. King noted that there was no evidence of endometriosis upon laparoscopy (although there had been an ovarian cyst, which the clinicians drained), but she opined that endometriosis is often chronic and may recur. (Tr. 460–61.) After consultation, the treatment plan for Ms. Conrad involved pelvic floor physical therapy and suppression of menses through continuous use of oral contraceptives. (Tr. 461.)

Ms. Bowman placed the referral for pelvic floor physical therapy on December 27, 2019. (Tr. 453.)

Ms. Conrad consulted with Rahel Ghenbot, M.D., in a telehealth appointment regarding her pelvic pain on June 10, 2020. (Tr. 483.) Ms. Conrad reported that she had been to four physical therapy sessions in 2020 but had discontinued because of the COVID-19 pandemic. (*See* Tr. 484; 486.) Ms. Conrad said that her pelvic pain had been getting progressively worse; she estimated that she is in pain—which can get to a ten out of ten on the pain scale—three out of every four days. (Tr. 483.) Dr. Ghenbot noted that Ms. Conrad had not attended enough physical therapy sessions to see results and planned to see Ms. Conrad in the office for a physical examination. (Tr. 486.)

Ms. Conrad attended an in-person medical visit with Jenna Lund, M.D., on July 29, 2020. (Tr. 477–78.) Ms. Conrad reported no significant changes to her symptoms and described her pain at the time of the appointment as "fairly manageable." (Tr. 478.) But she said she experiences an aching pain constantly that can suddenly and "randomly" become a cramping pain lasting for

13

minutes to days. (Tr. 478–79.) These episodes occur around three times per week but can be as frequent as daily. (*Id.*) On examination, Ms. Conrad's genitourinary structures were normal but she had tenderness with palpation of the uterus, bilateral adnexa, and obturator internus. (Tr. 480.) Dr. Lund opined that Ms. Conrad's reported symptoms and examination were consistent with pelvic floor dysfunction; she recommended that Ms. Conrad resume physical therapy and started her on a tricyclic antidepressant. (Tr. 481.)

Ms. Conrad followed up with Christine Santayana, D.O., on September 30, 2020. (Tr. 474.) Ms. Conrad reported that the physical therapy and new medication had not been helping. (Tr. 473–74.) Her physical examination again revealed normal genitourinary structures but tenderness. (Tr. 475.) Dr. Santayana started Ms. Conrad on a muscle relaxant, increased the dosage of her antidepressant, and recommended continued physical therapy. (Tr. 475–76.) Dr. Santayana further suggested that Ms. Conrad consider cognitive behavioral therapy. (Tr. 476.)

Ms. Conrad consulted with Natalie Gailey, a certified nurse practitioner, on February 17, 2021. (Tr. 535.) Ms. Conrad reported that she had discontinued her birth control medication; it is unclear from the medical note whether she had continued the other medications on which she had been started, but she said she "had been on" the antidepressant and she could not remember the other medication she had been prescribed. (*See id.*) On physical examination, she was not tender on pelvic palpation. (Tr. 537.) An annual gynecological examination was normal and Ms. Gailey recommended a pelvic ultrasound and sought more information about Ms. Conrad's previous examinations and treatment. (Tr. 537–38, 554.)

Ms. Conrad followed up with Ms. Bowman on February 19, 2021. (Tr. 608.) Ms. Conrad clarified that she had not followed up with Dr. Santayana's practice after September 2020 and had run out of medication, even though she felt that the muscle relaxant had helped her pain. (*Id.*) She

14

also reported "mild improvement" from physical therapy. (*Id.*) She said that her pain at the moment was "moderate." (*Id.*) Ms. Bowman recommended that Ms. Conrad undergo a pelvic ultrasound and refilled her prescription for muscle relaxant. (Tr. 611.)

Ms. Conrad underwent a pelvic ultrasound with Dr. Michael Subit on March 8, 2021. (Tr. 539.) No clear abnormalities were noted. (Tr. 539, 577–78.) Dr. Subit recommended potassium sensitivity testing. (Tr. 541.) Ms. Conrad underwent that test on April 5, 2021; it was negative. (Tr. 557.)

Ms. Conrad followed up with Dr. Elizabeth Chung on April 19, 2021. (Tr. 550.) Ms. Conrad continued to report similar symptomology as in previous appointments, noting that her pain was aggravated by postural changes and exercise and were alleviated by warm baths, rest, and muscle relaxants. (*Id.*) Dr. Chung discussed medication management with Ms. Conrad, who expressed an inclination toward treatment through oral contraceptive pills. (Tr. 553.)

A hysteroscopy in May 2021 revealed only normal or benign findings. (Tr. 759.)

Ms. Conrad followed up with Dr. Chung on June 1, 2021. (Tr. 546.) On physical examination, Ms. Conrad was nontender to palpation. (Tr. 549.) Dr. Chung reviewed Ms. Conrad's history and examination findings and assessed that she has a thickened endometrium. (Tr. 549.) She recommended a tissue-removal procedure. (*Id.*)

Ms. Conrad met with Dr. Chung for the procedure on June 16, 2021. (Tr. 565.) During the procedure, Dr. Chung confirmed the thickened endometrium; three small polyps were also noted and removed. (Tr. 565–66.) Pathology on the polyps was negative for malignancy. (Tr. 753.) Ms. Conrad said she was still experiencing pelvic pain weeks after the surgery, but she was nontender on examination and was ultimately cleared to return to normal activity. (Tr. 753–55.)

15

Ms. Conrad met with a new provider, Dr. Gubert Tan, regarding her neurofibromatosis on July 16, 2021. (Tr. 686.) She continued to report pelvic pain, summarizing the symptomology she had described to her previous doctors. (*Id.*) After reviewing her history and examination findings to date, Dr. Tan recommended additional MRI imaging and other examinations. (Tr. 689.)

Nerve conduction and electromyography testing in July 2021 were negative for abnormalities. (Tr. 694.)

Ms. Conrad followed up with Ms. Bowman on August 3, 2021. (Tr. 749.) Her pelvic and abdomen were not tender to palpation on examination. (Tr. 751–52.)

Ms. Conrad followed up with Ms. Bowman again on August 25, 2021. (Tr. 614.) She requested a referral to a gastroenterologist because her gynecological consultations had not revealed a definitive cause of her pain. (*Id.*) Ms. Conrad described that her pain can be daily or she can go days without pain. (*Id.*) A physical examination was again normal, and Ms. Bowman placed the GI referral. (Tr. 616–17.)

Ms. Conrad met with certified nurse practitioner Caley Parobek, associated with a GI practice, on September 9, 2021. (Tr. 589.) Ms. Conrad reported that she has two to four episodes of debilitating pain per week and "nothing helps relieve it." (Tr. 592.) There was again no abdominal tenderness on examination. (Tr. 595.) Ms. Parobek scheduled an upper endoscopy and a colonoscopy to rule out any GI etiology for Ms. Conrad's reported pain. (Tr. 596.)

Spinal MRI imaging in September 2021 revealed several neurofibromas at the L3 to S1 levels; Dr. Tan recommended a follow-up MRI in six months to monitor the masses. (Tr. 708.) Dr. Tan opined that these masses were "less likely" to be the cause of her pelvic pain but noted that he had scheduled a thoracic MRI to examine the lumbosacral nerves in that region. (*Id.*)

16

Ms. Conrad followed up with Dr. Chung on October 7, 2021. (Tr. 745.) On examination, Ms. Conrad was nontender to palpation. (Tr. 747–48.)

The GI procedures were performed in October 2021. (Tr. 642.) They revealed "colonic mucosa with reactive-appearing lymphoid aggregates and a small focus of glandular atypia, indefinite for dysplasia" and an esophageal squamous papilloma. (*Id.*) The examinations were otherwise normal. (Tr. 645, 647.)

At a mental health assessment on October 21, 2021, Ms. Conrad reported that before COVID she had attended trivia, that she frequents the library and attends concerts and that she attends social gatherings when they happen (although limited by the pandemic). (Tr. 490.) She said she has experienced pelvic pain for the past year. (*Id.*)

Ms. Conrad followed up with Dr. Chung on the same day. (Tr. 741.) On examination, Ms. Conrad was again nontender to palpation. (Tr. 743–44.) Dr. Chung noted that the recent colonoscopy had been normal and that Ms. Conrad would be following up with a repeat MRI regarding the spinal masses. (Tr. 744.)

Ms. Conrad followed up with Dr. Tan on November 17, 2021. (Tr. 710.) Dr. Tan noted that a September 2021 lumbosacral MRI had noted a "mild heterogeneous enhancing expansile appearance of the L3 through S5 nerve roots consistent with neurofibromas" and an "indeterminate enhancing lesion in the right ileus psoas musculature" with a "benign appearance." (Tr. 712.) The treatment plan was to conduct follow-up imaging of the brain and spine, continue on pain medications, continue to follow up with gastroenterology, follow-up with neurosurgery, and follow-up with Dr. Tan in six months. (Tr. 713.)

Ms. Conrad met with Dr. Chung on November 19, 2021. (Tr. 542.) Ms. Conrad elected to forgo pelvic surgeries "due to having new tumors." (Tr. 545.)

In a mental health transfer summary dated January 24, 2022, it is noted that Ms. Conrad at her admission in March 2019 reported helping her mother with meals and daily living; Ms. Conrad expressed that she felt fatigued from her work and did not want to go to work. (Tr. 672.)

Ms. Conrad has complained of pelvic pain in her individual therapy sessions. (*See* Tr. 957.)

Ms. Conrad consulted with physician assistant Emily Keller on March 22, 2022. (Tr. 721.) Ms. Conrad again described her symptomology of pelvic pain. (Tr. 723.) Ms. Keller recommended a pituitary work-up and noted that they were awaiting the results of the repeat MRI imaging Dr. Tan had ordered. (Tr. 722.)

At a therapy appointment on the same day, Ms. Conrad expressed hope that she could become more social and reported that she was taking care of her mother every day; she was interested in being certified as a home health aide. (Tr. 966.)

Ms. Conrad consulted with Ms. Bowman on May 12, 2022, saying that she had not received any results from the GI testing. (Tr. 814.) Ms. Conrad denied abdominal pain and all other complaints at the appointment. (*Id.*) Ms. Bowman noted that the GI practice had tried to get a follow-up appointment scheduled with Ms. Conrad but could not reach her. (Tr. 817.)

Ms. Conrad cancelled a counseling appointment on May 24, 2022, to attend a work meeting to get re-certified in cardiopulmonary resuscitation. (Tr. 1048.)

Ms. Conrad met with Ms. Gailey on June 1, 2022. (Tr. 919.) Ms. Conrad reported that her pain was a ten out of ten and described it as aching, sharp, and throbbing. (*Id.*) On examination, Ms. Conrad appeared to be in no acute distress. (Tr. 921.) Ms. Conrad was told to follow up with Dr. Chung and to go to an emergency room if the pain got too severe or if she developed vomiting and a fever. (Tr. 922.)

At a therapy appointment on June 7, 2022, Ms. Conrad reported that she had been too busy taking care of her mother and brother to complete her therapy "homework" assignments. (Tr. 989.)

Ms. Conrad followed up with Dr. Chung on June 10, 2022. (Tr. 929.) On examination, Ms. Conrad was normal and nontender. (Tr. 931–32.) Dr. Chung completed an ultrasound and ordered lab tests. (Tr. 932.) Pathology tests on endometrial curettings and polyps revealed either normal or benign findings. (Tr. 580.)

Ms. Conrad underwent a clinical mental health interview with Sudhir Dubey, Psy.D., on September 6, 2022. (Tr. 790–96.)

At a therapy appointment on April 11, 2023, Ms. Conrad reported that she had had a good weekend, having met one of her favorite authors at a book signing. (Tr. 1004.)

A brain MRI in April 2023 revealed that any abnormalities—including a meningioma planum sphenoidal and the right optic nerve glioma—were stable; the MRI was "unremarkable." (Tr. 1070–71.)

Ms. Conrad met with Dr. Chung on May 18, 2023. (Tr. 933.) Ms. Conrad complained that she did not know if her oral contraceptive was helping with her pelvic pain. (*Id.*) A physical examination was normal; there was no tenderness to palpation. (Tr. 935–36.) Dr. Chung made a medication change. (Tr. 937.)

Ms. Conrad consulted with neurosurgeon Cristina Ghinda, M.D., on May 23, 2023. (Tr. 1057.) Dr. Ghinda opined that Ms. Conrad was "clinically stable" with respect to her neurofibromatosis but would need "close follow-up," including another MRI scan in one year. (*Id.*)

Ms. Conrad underwent a follow-up ultrasound on June 2, 2023. (Tr. 941.) The scan was normal except for a small subserosal fibroid. (Tr. 943.)

## IV.    THE ALJ'S DECISION

The ALJ determined that Ms. Conrad met the insured-status requirements of the Social Security Act through December 31, 2024, and has not engaged in substantial gainful activity since September 1, 2019 (the alleged disability onset date). (Tr. 19.)

The ALJ next determined that Ms. Conrad had the following severe impairments: (1) neurofibromatosis; (2) chronic pelvic/abdominal pain of unknown etiology; (3) blindness in the right eye; (4) depression; and (5) anxiety (Tr. 20.)

The ALJ also noted that Ms. Conrad had the following non-severe impairments: (1) headaches with rare frequency (once every three months) that respond to ibuprofen; (2) a stable right optic glioma; (3) an extra-axial planum sphenoidale mass; and (4) an intrathecal extramedullary enhancing nodule at the L3 level. (*Id.*) While the ALJ found these conditions to be non-severe, the ALJ noted that she considered all these conditions when determining Ms. Conrad's residual functional capacity. (*Id.*)

The ALJ determined that none of Ms. Conrad's impairments, whether considered singly or in combination, met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (*Id.*)

The ALJ determined that Ms. Conrad had the residual functional capacity ("RFC") to perform light work with a number of additional limitations. (Tr. 22.) Specifically, Ms. Conrad cannot climb ladders, ropes, or scaffolds, and should avoid unprotected heights. (*Id.*) Ms. Conrad is further limited to jobs that involve understanding, remembering, and following only simple instructions and directions, in a static work environment, with no requirement for binocular vision. (*Id.*) The ALJ determined that Ms. Conrad can tolerate only occasional, superficial contact with the public. (*Id.*)

The ALJ found that Ms. Conrad was 30 years old on the alleged disability onset date and

had at least a high school education. (Tr. 30.)

The ALJ determined that Ms. Conrad was unable to perform her past relevant work as a housekeeper, laundry attendant, or nurse assistant. (Tr. 29.)

However, the ALJ determined that—considering Ms. Conrad's age, education, work experience, and RFC—there were jobs that existed in significant numbers in the national economy that she could perform, including work as a "marker" (DOT 209.587-034), "routing clerk" (DOT 222.687-022), or "router" (DOT 222.587-038). (*Id.*) Accordingly, the ALJ determined that Ms. Conrad is not disabled. (Tr. 31.)

## V.    LAW & ANALYSIS

### A.    <u>Standard of Review</u>

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 Fed. Appx. 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g).

"Under the substantial evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficient evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (cleaned up) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The standard for "substantial evidence" is "not high." *Id*. While it requires "more than a mere scintilla," "[i]t means—and means only—'such relevant evidence as

a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Consolidated Edison*, 305 U.S. at 229).

In addition to considering whether substantial evidence supports the Commissioner's decision, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, . . . a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)) (alteration in original).

### B.    Standard for Disability

Consideration of disability claims follows a five-step review process. 20 C.F.R. § 416.920. First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. § 416.920(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. § 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990) (quoting 20 C.F.R. §§ 404.1520(c) and 416.920(c)).

Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. § 416.920(d).

Before considering Step Four, the ALJ must determine the claimant's residual functional capacity, *i.e.*, the claimant's ability to do physical and mental work activities on a sustained basis despite limitations from her impairments. 20 C.F.R. § 416.920(e). An RFC "is the most [a claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 416.945(a)(1). Agency regulations direct the ALJ to consider the functional limitations and restrictions resulting from a claimant's medically determinable impairment or combination of impairments, including the impact of any related symptoms on the claimant's ability to do sustained work-related activities. *See* Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 at *5 (July 2, 1996).

"A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner." *Golden v. Berryhill*, No. 1:18CV00636, 2018 WL 7079506, at *17 (N.D. Ohio Dec. 12, 2018), *report and recommendation adopted sub nom*, 2019 WL 415250 (N.D. Ohio Feb. 1, 2019). The ALJ is "charged with the responsibility of determining the RFC based on [the ALJ's] evaluation of the medical and non-medical evidence." *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013). "[T]he ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support [the ALJ's] decision, especially when that evidence, if accepted, would change [the ALJ's] analysis." *Golden*, 2018 WL 7079506 at *17.

At the fourth step, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 416.920(e)–(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, the claimant is not disabled if other work exists in the national economy that the claimant can perform. 20 C.F.R. § 416.920(g). *See Abbott*, 905 F.2d at 923.

### C.    **Analysis**

#### 1.      *First Assignment of Error – SSR 16-3p*

In her first assignment of error, Ms. Conrad argues that the ALJ improperly concluded that her subjective description of the intensity, persistence, and limiting effect of her "intermittently severe" pelvic pain was only partially consistent with the record evidence. (Pl.'s Merit Br. at 11, ECF No. 9, PageID# 1164.) She contends that the ALJ failed to explain how the objective medical findings were inconsistent with her description of debilitating pain or with the measures she said she needed to relieve her pain, including rest, baths, and using a heating pad. (*Id.*) She further contends that the ALJ inaccurately stated that the treatment record reflected "some significant gaps and compliance issues." (*Id.*) She argues that these failures require remand.

SSR 16-3p provides that the SSA will conduct a two-step process in considering a claimant's symptoms. 2017 WL 5180304, at *3 (Oct. 25, 2017). At step one, the SSA determines whether the individual has one or more medically determinable impairments that could reasonably be expected to produce the individual's alleged symptoms. *Id.* If so, at step two, the SSA evaluates the intensity and persistence of a claimant's symptoms, such as pain, to determine the extent to which those symptoms limit the claimant's ability to work. *Id.* at *4.

With respect to a claimant's subjective statements, SSR 16-3p provides that the SSA will "consider an individual's statements about the intensity, persistence, and limiting effects of symptoms" and "will evaluate whether the statements are consistent with objective medical

evidence and the other evidence." *Id.* at *6. SSR 16-3p identifies seven factors that the SSA will consider in evaluating an individual's symptoms: (1) daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) factors that precipitate and aggravate symptoms; (4) the type, dosage, effectiveness, and side effects of any medication; (5) treatment an individual receives or has received other than medication; (6) any measures other than treatment an individual uses or has used; and (7) any other factors concerning the claimant's functional limitations and restrictions. *Id.* at *7–8. "The ALJ need not analyze all seven factors but should show that she considered the relevant evidence." *Phillips v. Comm'r of Soc. Sec.*, No. 3:22-CV-01144-JGC, 2023 WL 4078204, at *8 (N.D. Ohio Apr. 4, 2023), *report and recommendation adopted*, 2023 WL 5602726 (N.D. Ohio Aug. 30, 2023).

Notably, "[a] plaintiff does not demonstrate a violation of SSR 16-3p simply by reiterating the same subjective symptoms she believes should have been credited by the ALJ, as an ALJ is not required to accept a claimant's subjective complaints." *Zingale v. Kijakazi*, No. 1:20-cv-02197, 2022 WL 824148, at *8 (N.D. Ohio Mar. 18, 2022); *see also Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003) ("[A]n ALJ is not required to accept a claimant's subjective complaints"). Moreover, "[i]t is for the administrative law judge, not the reviewing court, to judge the consistency of a claimant's statements." *Lipanye v. Comm'r of Soc. Sec.*, 802 F. App'x 165, 171 (6th Cir. 2020). However, while determinations regarding subjective complaints rest with the ALJ, "those determinations must be reasonable and supported by substantial evidence." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 249 (6th Cir. 2007); *see also Kurman v. Comm'r of Soc. Sec.*, No. 1:20-cv-01837, 2022 WL 765072, at *3 (N.D. Ohio Mar. 14, 2022) ("The ALJ's decision . . . must be rooted in the record and must contain specific reasons for the weight given to the [claimant's] symptoms.") (quotations omitted).

25

Here, at the first step of the analysis, the ALJ concluded that Ms. Conrad's medically determinable impairments could reasonably be expected to cause "some" of her alleged symptoms. (Tr. 23.) Moving to the second step, though, the ALJ concluded that Ms. Conrad's statements about the intensity, persistence, and limiting effects of her symptoms were "not entirely consistent with the medical evidence and other evidence in the record." (*Id.*) Specifically, the ALJ reasoned that her allegations were "inconsistent with her activities of daily living including two part-time jobs, one performed at the medium exertional level and one at the light level, the objective findings on exam, testing, and imaging, her reports to providers, . . . and her treatment history." (*Id.*)

The ALJ continued, pointing out what she viewed as inconsistencies in Ms. Conrad's statements. The ALJ accurately noted that Ms. Conrad had claimed in her function report that she did not care for anyone, but she told providers at various points that she cared for her mother and brother. (Compare Tr. 286 with Tr. 672, 966, and 989.) The ALJ further pointed out that Ms. Conrad had worked as an STNA during a portion of the relevant period, sometimes lifting up to 50 pounds at a time, and was currently working at a library, sometimes up to eight hours a day; even after completing her function report, she had expressed an interest in becoming a certified home health aide and continued caring extensively for her mother and brother. (Tr. 24–25.)

The ALJ also explained her reasoning about how the medical evidence was inconsistent with Ms. Conrad's statements. The ALJ acknowledged Ms. Conrad's history of seeking opinions to determine the source of her alleged pain. (Tr. 25.) But the ALJ pointed out that the most recent neurological records reflect that her neurofibromatosis was clinically stable with no new focal neurological symptoms. (*Id.*)

As for pelvic pain, Ms. Conrad is correct that the ALJ reasoned in part that "some significant gaps and compliance issues" in the treatment record might suggest "less bothersome

symptoms than alleged." (*Id.*) Specifically, the ALJ pointed out that Ms. Conrad described intermittent debilitating pain but also "admitted to missing pills prior to the episodes" and in at least one instance "never followed up and ran out of medications." (*Id.*)

Ms. Conrad alleges that this reasoning reflects a factual error and fundamentally mischaracterizes the record; she says she missed birth control medication on one occasion, suggesting that this is irrelevant because that medication did not reduce the frequency or intensity of her pelvic pain. (Pl.'s Merit Br. at 13, ECF No. 9, PageID# 1166.) She points out that many medical records reflect that she continually reported pelvic pain without reference to missed medication. (*Id.* at PageID# 1166–67.) She further argues that the ALJ mischaracterized her follow-up, as records reflect that Ms. Conrad reported difficulty in scheduling appointments with several practices and show that she was diligently seeking treatment. (*Id.* at PageID# 1168–69.)

The Commissioner defends the ALJ's summary of the evidence. The Commissioner points out that Ms. Conrad admitted to being non-compliant with her oral contraceptive and failed to follow up with her OBGYN after she ran out of muscle relaxant. The Commissioner acknowledges that Ms. Conrad reported having a "hard time" time getting back in to see her physician but says it is not clear why Ms. Conrad could not simply call to have her prescription refilled.

In reply, Ms. Conrad insists that one instance of missing birth control pills is not significant where there was no evidence that Ms. Conrad had any relief from that medication. *See Miller v. Comm'r of Soc. Sec.*, 2017 WL 2952780, *3 (N.D. Ohio July 11, 2017) (citing *Fraley v. Sec'y of Health & Human Servs.*, 733 F.2d 437, 440 (6th Cir. 1984)) ("[T]he burden is on the government to provide evidence that treatment, if followed, would have restored the ability to work.").

After careful consideration, I find no error meriting a remand in the ALJ's discussion of noncompliance or treatment gaps. As an initial matter, the ALJ did not rely extensively on a finding

of noncompliance; at most, she concluded that "some gaps and compliance issues . . . *may suggest* less bothersome symptoms than alleged in disability reports." (Tr. 27) (emphasis added). Reading the decision as a whole, it is clear that the ALJ was most convinced by the lack of a determinable etiology for the pain despite numerous tests, the consistently unremarkable physical examinations even at appointments where Ms. Conrad was complaining of debilitating pain, and the fact that Ms. Conrad was able to work part-time jobs while caring extensively for her mother and brother and engaging in reading hobbies.

Moreover, I do not view the ALJ's findings of "some treatment gaps and compliance issues" as materially inaccurate or misleading. Ms. Conrad admits to missing oral contraceptives on one occasion. While it is true that she did not report that the medication alleviated her pain, it must be also acknowledged that her doctors specifically prescribed the medication to treat the possible endometriosis and to try to mitigate the pelvic pain, which tended to be aggravated during menses. (*See, e.g.*, Tr. 461.) In other words, the medication was not, as Ms. Conrad seems to suggest, irrelevant to her treatment; it was a core part of her doctors' treatment plan. Ms. Conrad also does not seem to contest that she ran out of muscle relaxant between September 2020 and February 2021 and did not follow up with Ms. Bowman or Dr. Santayana's practice for a refill, even though she felt that the muscle relaxant had helped her pain. (Tr. 608.) Ms. Conrad also discontinued pelvic floor physical therapy, which had been recommended. (*See* Tr. 484; 486.)

Although it must be noted that these compliance gaps occurred between late 2019 and early 2021, a period that included the early COVID pandemic, I cannot say that the ALJ erred or mischaracterized the record by stating that these gaps "may suggest" less bothersome symptoms than alleged.

As mentioned above, any gaps or compliance issues were not the primary reason for the ALJ's finding of inconsistency. The ALJ thoroughly summarized the medical records documenting specialists' attempt to find the root cause of Ms. Conrad's reported pain. She noted that a laparoscopy was negative for endometriosis and that ultrasounds, an endometrium biopsy, GI testing, MRI imaging, and other examinations "did not establish a definite diagnosis" and were largely either normal or benign, except for revealing a thickened endometrium. (Tr. 26–27.)

In summarizing her conclusions, the ALJ acknowledged that Ms. Conrad's pain complaints were "well documented in the record" and that the various specialists she has seen "do not all agree on the source of the pain." (Tr. 27.) But she concluded that the "physical findings on exam, testing and imaging do not support the extent of limitations she has alleged," as "no evidence . . . rules out light exertional level work" with the limitations included in the RFC, especially in light of Ms. Conrad's "considerable activities of daily living." (*Id.*)

Nevertheless, the ALJ concluded that the medical findings and the results of MRI tests convinced her to limit Ms. Conrad to work at the light exertional level "to avoid aggravation of her impairments and reduce the pain described." (Tr. 26.)

Ms. Conrad insists that her "persistent attempts to obtain relief through treatment with multiple specialists and obtaining testing" show that her symptoms were intense and persistent. *See* SSR 16-3p ("Persistent attempts to obtain relief of symptoms, such as increasing dosages and changing medications, trying a variety of treatments, referrals to specialists, or changing treatment sources may be an indication that an individual's symptoms are a source of distress and may show that they are intense and persistent."). She argues that the ALJ failed to explain how the objective findings are inconsistent with her allegations regarding pelvic pain, and she says that the record contains abnormal objective findings consistent with a disabling impairment.

29

After careful consideration, I again disagree that the ALJ made an error requiring remand. The ALJ accurately summarized the extensive medical evidence and correctly acknowledged that—while Ms. Conrad consistently reported that she was experiencing intermittent pain and was sometimes tender on examination—in many instances her physical examinations were normal and multiple tests (neurological, gynecological, gastroenterological, and otherwise) revealed either normal findings or benign findings except for a thickened endometrium. This is not a case where an ALJ merely set forth a "rote recitation of the claimant's testimony and some of the medical evidence followed by a conclusory statement . . . ." *Bailey v. Comm'r of Soc. Sec.*, No. 5:13 CV 01672, 2014 WL 3054262, *6 (N.D. Ohio July 3, 2014). The abnormal findings Ms. Conrad identifies in her brief as contradicting the ALJ's analysis—an ovarian cyst, small fibroids, a resolved intussusception, the GI papilloma and polyp, and the spinal neurofibromas—were either treated (the cyst was drained, for instance), found to be benign, resolved on their own, or were ruled out as causes for her pelvic pain.

Finally, Ms. Conrad alleges that the ALJ failed to grapple with the fact that Ms. Conrad was self-treating her pain with baths and heating pads and failed to identify how her part-time work was inconsistent with her alleged pain. I again find no error here. As set forth above, the ALJ was not required to analyze all seven factors of SSR 16-3p. *Phillips v. Comm'r of Soc. Sec.*, No. 3:22-CV-01144-JGC, 2023 WL 4078204, at *8 (N.D. Ohio Apr. 4, 2023), *report and recommendation adopted*, 2023 WL 5602726 (N.D. Ohio Aug. 30, 2023). Reading the decision as a whole, it is clear that the ALJ considered the relevant evidence. Moreover, the ALJ specifically explained why she found Ms. Conrad's part-time work to be inconsistent with her alleged pain. The ALJ discussed that, for a portion of the relevant period, Ms. Conrad was an STNA performing work at the medium exertional level. The ALJ further pointed out that Ms. Conrad was able to

work part-time, up to eight-hour shifts, while still maintaining significant activities of daily living outside of work—including caring so extensively for her mother that she considered becoming a certified home health aide.

"It is for the administrative law judge, not the reviewing court, to judge the consistency of a claimant's statements." *Lipanye v. Comm'r of Soc. Sec.*, 802 F. App'x 165, 171 (6th Cir. 2020). Here, I find that the ALJ's determinations were adequately explained, "reasonable[,] and supported by substantial evidence." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 249 (6th Cir. 2007). Accordingly, I recommend that Ms. Conrad's first assignment of error be overruled.

### 2. Second Assignment of Error – RFC and Medical Opinion Evidence

In her second assignment of error, Ms. Conrad argues that (1) the ALJ and the state agency medical consultants erred by using the agency findings from her prior application "as a starting point for the current evaluation" and (2) the ALJ failed to account for certain postural limitations identified by the agency consultants without discussing the supportability or consistency of those opinions.

Ms. Conrad's first argument is somewhat confusing. She acknowledges that the agency consultants and the ALJ all found that there was new and material evidence of pelvic floor myalgia that affects her functioning and, therefore, did not adopt the findings of the prior ALJ from Ms. Conrad's previous disability application. (*See* Tr. 28.) Yet she argues that the agency nevertheless violated AR 24-1(6) and *Earley v. Comm'r of Soc. Sec.*, 893 F.3d 929 (6th Cir. 2018), which in short requires agency consultants and ALJs to newly consider a disability claim under the sequential-evaluation process, without applying a presumption that a previous RFC from a different application period remains the claimant's RFC for the period at issue.

While Ms. Conrad acknowledges that the consultants and ALJ here did not explicitly apply a presumption, and indeed found a new severe impairment not present in her previous application, she argues that the resulting RFC (as it is identical to her previous RFC) *ipso facto* proves that the agency did not give her claim the "fresh review" required by *Earley* and the related regulations.

The Commissioner defends the ALJ's decision as a thorough explanation of the serious evaluation the ALJ gave to Ms. Conrad's claim. The Commissioner points out that the ALJ explicitly acknowledged that changes in the law prevented her from adopting the prior ALJ's RFC. (*See* Tr. 28.) The Commissioner argues that, as long as an ALJ gives the evidence the new review to which it is entitled, it is permissible for the ALJ to reach conclusions that are similar to a prior RFC.

After careful consideration, I agree with the Commissioner on both the law and the facts.

The Sixth Circuit has made clear that *Earley* was concerned with circumstances in which agency decisionmakers treat prior findings as *binding*. *See Dennis D. v. Comm'r of Soc. Sec.*, No. 23-3667, 2024 WL 1193662, *6 (6th Cir. Mar. 20, 2024) (allowing an ALJ to presume the accuracy of a prior finding where there was evidence that the ALJ understood that they were not bound by the prior finding); *See also Earley*, 893 F.3d at 933 ("[I]t is fair for an [ALJ] to take the view that, absent new and additional evidence, the first [ALJ's] findings are a legitimate, albeit *not binding*, consideration in reviewing a second application.") (emphasis added).

In deciding whether an ALJ improperly considered herself bound by a previous decision, courts look to the substance of the decision itself. Thus, even decisions in which the ALJ improperly states that they were bound by a previous decision have been affirmed where the decision nevertheless shows that the ALJ gave the evidence the "fresh look" to which it is entitled. *See Dennis D.*, 2024 WL 1193662 at *4.

32

Looking to the ALJ's decision here, I am firmly convinced that the ALJ and agency consultants conducted an in-depth review and analysis of the new evidence relevant to Ms. Conrad's current claim period, even if they also considered the evidence and findings from the prior decision. I have set forth the detailed nature of the ALJ's recitation of the medical evidence above in discussing Ms. Conrad's first assignment of error.

Moreover, I do not find the fact that the ALJ adopted the same RFC as in the prior application as *ipso facto* proof that she considered herself bound by the prior decision, even where a new severe impairment was found. As an initial matter, the ALJ specifically acknowledged that she was not bound. Beyond that, the finding of a medically determinable impairment—even a severe one—does not automatically mean that a claimant has resulting functional limitations in their ability to work. *See e.g.*, *Kubas v. Comm'r of Soc. Sec.*, No. 1:22-CV-00856, 2023 WL 4744279, at *8 (N.D. Ohio July 25, 2023) ("The presence of a severe impairment alone does not automatically warrant an RFC limitation if it does not impact a claimant's ability to work."). Further, "a diagnosis alone is not enough to establish specific functional limitations as a matter of right." *E.g.*, *Thornton v. Saul*, No. 4:20-CV-01420-JRA, 2021 WL 3934332, at *11 (N.D. Ohio June 21, 2021), *report and recommendation adopted*, *Thornton v. Comm'r of Soc. Sec.*, No. 4:20CV1420, 2021 WL 4025192 (N.D. Ohio Sept. 2, 2021) (quoting *Teresa F. v. Saul*, No. 1:18-cv-01967-JRS-MPB, 2019 WL 2949910, at *5 n. 7 (S.D. Ind. July 9, 2019); *see also* Social Security Ruling 16–3p, 2016 WL 1119029, at *2 (2016) ("Under our regulations, an individual's statements of symptoms alone are not enough to establish the existence of a physical or mental impairment or disability.")).

As discussed further above, the ALJ carefully explained that she found Ms. Conrad's chronic pelvic/abdominal pain of unknown etiology to be severe but not inconsistent with light work inclusive of the additional limitations in the RFC.

In conclusion, there is ample evidence that the ALJ gave Ms. Conrad's application the "fresh look" to which it was entitled. I turn next to her arguments regarding the ALJ's treatment of the agency consultant's opinions.

Ms. Conrad identifies that the medical consultants opined that she could only frequently climb ramps and stairs, stoop, kneel, or crouch, and could only occasionally crawl. (Tr. 88–89, 110.) The ALJ did not include these postural limitations in her RFC. (Tr. 22.)

Social Security Ruling ("SSR") 98-6p provides that "[i]f the RFC assessment conflicts with an opinion from a medical source, the [ALJ] must explain why the opinion was not adopted." 1996 WL 374184, at *7 (July 2, 1996). A reviewing court must read the ALJ's decision as a whole. *See Taylor v. Kijakazi*, No. 1:20-cv-01121, 2021 WL 4477865, *8 (N.D. Ohio Sept. 30, 2021).

Agency regulations state that the Social Security Administration "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources." 20 C.F.R. § 404.1520c(a).

 Instead, the SSA considers opinions from medical sources under five factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors, such as familiarity with other evidence in the claim or with the disability program's policies and evidentiary requirements. 20 C.F.R. § 404.1520c(c). Section 404.1520c(b)(1) specifically provides that "it is not administratively feasible for [the ALJ] to

articulate in each determination or decision how [the ALJ] considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record." 20 C.F.R. § 404.1520c(b)(1). Of the five factors, supportability and consistency are the most important, and an ALJ must explain how the ALJ considered them. 20 C.F.R. § 404.1520c(b)(2). The ALJ "may" but "is not required to" explain how the ALJ considered the remaining factors. *Id.*

The "supportability" factor looks to how well the medical source supports the opinion with objective medical evidence from the record. See 20 C.F.R. § 404.1520c(c)(1). "In other words, the supportability analysis focuses on the physicians' explanations of the opinions." *Lavenia v. Comm'r of Soc. Sec.*, No. 3:21cv674, 2022 WL 2114661, at *2 (N.D. Ohio June 13, 2022) (quoting *Coston v. Comm'r of Soc. Sec.*, No. 20-12060, 2022 WL 989471, at *3 (E.D. Mich. Mar. 31, 2022)). The "consistency" factor looks to how consistent the medical opinion is with evidence from other medical and nonmedical sources. *See* 20 C.F.R. § 404.1520c(c)(2).

"As long as the ALJ discussed the supportability and consistency of the opinion and supported [the ALJ's] conclusions with substantial evidence within his decision, the Court will not disturb [the ALJ's] decision." *Njegovan v. Comm'r of Soc. Sec.*, No. 5:21-CV-00002-CEH, 2022 WL 1521910, at *4 (N.D. Ohio May 13, 2022).

Here, in explaining why she did not adopt these additional limitations, the ALJ wrote that she found the agency medical opinions on postural limitations to be "unpersuasive" because the consultants "did not have the benefit of the entire record including testimony regarding the work performed during the period of alleged disability." (Tr. 28.) While the ALJ found those limitations to be unsupported by the medical record, she found the consultants' opined limitations of light work, prohibiting climbing things like ladders, and removing work requiring binocular vision to be supported and consistent with the record. (*Id.*)

The Commissioner defends this explanation, arguing that reading the opinion as a whole reveals that the ALJ discounted these limitations as unsupported and not consistent with the record because of Ms. Conrad's "regularly unremarkable imaging and physical examinations" and because Ms. Conrad's work as a health aid and at a library—and her ability to care for her mother and brother—were inconsistent with the postural limitations opined by the consultants.

After careful consideration, I agree with the Commissioner. While the ALJ's specific discussion of these postural limitations is cursory, in reading the decision as a whole, her reasoning encompasses both supportability and consistency and is supported by substantial evidence.

Of course, the agency consultants were not Ms. Conrad's treating physicians, so they have no individual treatment notes. The ALJ identified that their postural limitations were based on an incomplete review of the relevant evidence and were thus unsupported. The ALJ further found the limitations to be inconsistent with other record evidence. And the Commissioner is correct that the decision as a whole makes clear why the ALJ reached that conclusion. Throughout the decision, the ALJ repeatedly referred to Ms. Conrad's activities of daily living, including her ability to work part-time (including in medium-exertion work for a portion of the alleged disability period) and her ability to care extensively for her mother and brother. The ALJ also thoroughly discussed the record medical evidence, including several findings of spinal tenderness, and weighed those findings against numerous normal postural findings. (*See, e.g.*, Tr. 26 (discussing the records related to knee pain, thigh pain, spinal pain, which included a normal MRI, negative straight leg raises, and full strength through the extremities, among other things)).

It is clear from the decision as a whole that the ALJ found the postural limitations opined by the consultants to be unsupported and inconsistent with the record evidence. And considering

the substantial evidence standard, I further find that the ALJ's conclusions in this regard are supported by substantial evidence.

"The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts." *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (*quoting Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). "[T]he Commissioner's decision cannot be overturned if substantial evidence, or even a preponderance of the evidence, supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). A reviewing court may not "try the case de novo, nor resolve conflicts in evidence, nor decide questions of credibility." *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020) (*quoting Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984)).

I am convinced that a reasonable mind might accept the evidence the ALJ relied upon as adequate to support the ALJ's conclusions and RFC. *See Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

I therefore recommend that the Court overrule Ms. Conrad's second assignment of error.

## VI.     RECOMMENDATION

Based on the foregoing, I RECOMMEND that the Court AFFIRM the Commissioner's final decision.

Dated:  November 18, 2025                            /s *Jennifer Dowdell Armstrong*
                                                                    Jennifer Dowdell Armstrong
                                                                    U.S. Magistrate Judge

## VII.    NOTICE TO PARTIES REGARDING OBJECTIONS

Local Rule 72.3(b) of this Court provides:

> **Any party may object to a Magistrate Judge's proposed findings, recommendations or report made pursuant to Fed. R. Civ. P. 72(b) within fourteen (14) days after being served with a copy thereof, and failure to file timely objections within the fourteen (14) day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure**. Such party shall file with the Clerk of Court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. **Any party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.** The District Judge to whom the case was assigned shall make a <u>de novo</u> determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. The District Judge need conduct a new hearing only in such District Judge's discretion or where required by law, and may consider the record developed before the Magistrate Judge, making a determination on the basis of the record. The District Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

*Id.* (emphasis added).

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; a general objection has the same effect as would a failure to object. *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).

Stated differently, objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates

38

Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, *2 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878–79 (6th Cir. 2019).