**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ALEXANDRA K. CONRAD, | ) | CASE NO. 1:25-cv-00601 |
| | ) | |
| Plaintiff, | ) | JUDGE DAVID A. RUIZ |
| | ) | |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOC. SEC., | ) | |
| | ) | **MEMORANDUM OPINION AND ORDER** |
| Defendant. | ) | |
| | ) | |

Plaintiff Alexandra K. Conrad's Complaint challenges the final decision of the

Commissioner of Social Security denying her application for Social Security Disability Benefits

and Supplemental Security Income. (R. 1). Pursuant to Local Rule 72.2, the case was referred to

a Magistrate Judge. The Magistrate Judge issued a Report and Recommendation recommending

that the Court affirm the Commissioner's decision. (R. 13). Plaintiff filed objections within the

fourteen-day deadline. (R. 14). The Commissioner filed a response. (R. 15).

For the reasons below, Plaintiff's objections (R. 14) are overruled, and the Report and

Recommendation (R. 13) is adopted.

**I. Standard of Review**

When a magistrate judge submits a Report and Recommendation, the Court is required to

conduct a *de novo* review of those portions of the Report to which an objection has been made.

28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3); Local Rule 72.3(b). "A general objection to the

entirety of the magistrate's report has the same effects as would a failure to object." *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505, 509 (6th Cir. 1991); *accord Austin v. Comm'r of Soc. Sec.*, 2021 WL 1540389, at *4 (N.D. Ohio, Apr. 19, 2021) (finding that a general objection that merely restates an argument previously presented or simply voices a disagreement with a magistrate judge's suggested resolution "has the same effects as would a failure to object.") (citations omitted).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *see also Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). "The substantial-evidence standard ... presupposes that there is a *zone of choice* within which the decisionmakers can go either way, without interference by the courts." *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (emphasis added). Therefore, if substantial evidence supports the ALJ's decision, a court must defer to that finding "even if there is substantial evidence in the record that would have supported an opposite conclusion." *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).

## II. Analysis

Plaintiff's Brief on the Merits raised two assignments of error: (1) the ALJ failed to

evaluate the persuasiveness of Plaintiff's symptoms; and (2) the ALJ failed to identify substantial evidence supporting the RFC finding and failed to evaluate the medical opinions pursuant the regulations. (R. 9). Plaintiff's objections only take issue with the Magistrate Judge's recommended disposition of the first assignment of error. (R. 14).

Plaintiff's objection generally reiterates the arguments she made in her brief on the merits and disagrees with the ALJ's resolution of the issue. As noted above, a general objection to the magistrate's report has the same effects as a failure to object, and an objection that merely restates a previous argument or disagrees with a magistrate judge's suggested resolution also has the same effects as would a failure to object. Plaintiff's objections veer perilously close to a general objection that merely voices disagreement with the Magistrate Judge's resolution. She fails to identify any legal error in the recommended disposition. Nevertheless, the Court proceeds to address her argument.

The Social Security Administration has stated "[i]n evaluating an individual's symptoms, it is not sufficient for our adjudicators to make a single, conclusory statement that 'the individual's statements about his or her symptoms have been considered' or that 'the statements about the individual's symptoms are (or are not) supported or consistent.'" Social Security Ruling ("SSR") 16-3p, 2016 SSR LEXIS 4, 2017 WL 5180304 at *10 (Oct. 25, 2017). Rather, an ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." 2016 SSR LEXIS 4, [WL] at *10. A reviewing court should not disturb an ALJ's credibility determination "absent [a] compelling reason," *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001), and "in practice ALJ credibility findings have become essentially 'unchallengeable.'"

3

*Hernandez v. Comm'r of Soc. Sec.*, 644 Fed. App'x 468, 476 (6th Cir. 2016) (*citing Payne v. Comm'r of Soc. Sec.*, 402 Fed. App'x 109, 113 (6th Cir. 2010)).

According to SSR 16-3p, evaluating an individual's alleged symptoms entails a two-step process that involves first deciding whether a claimant has an "underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce an individual's symptoms, such as pain."[1] 2016 SSR LEXIS 4, 2017 WL 5180304 at *2-3. The ALJ's decision found the first step was satisfied and states that Plaintiff's medically determinable impairments "could reasonably be expected to cause some of the alleged symptoms...." (R. 7, PageID# 86, Tr. 23).

After step one is satisfied, an ALJ should consider the intensity, persistence, and limiting effects of an individual's symptoms. The ALJ concluded as follows:

> [T]he claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision. As for the claimant's statements about the intensity, persistence, and limiting effects of her symptoms, they are inconsistent with her activities of daily living including two part-time jobs, one performed at the medium exertional level and one at the light level, the objective findings on exam, testing, and imaging, her reports to providers, her activities of daily living, and her treatment history.
>
> Further, the claimant denied taking care of anyone else (other than her cat), in her function report (B5E), but she tells providers that she takes care of her mother. On

---

[1] "The Sixth Circuit characterized SSR 16-3p ... as merely eliminating 'the use of the word credibility . . . to clarify that the subjective symptoms evaluation is not an examination of an individual's character." *Butler v. Comm'r of Soc. Sec.*, No. 5:16cv2998, 2018 U.S. Dist. LEXIS 44551, 2018 WL 1377856, at *12 (N.D. Ohio, Mar. 19, 2018) (Knepp, M.J.) (quoting *Dooley v. Comm'r of Soc. Sec.,* 656 Fed. App'x 113, 119 n.1 (6th Cir. 2016)). Like several other courts, this court finds little substantive change between the two social security rulings, and the changes largely reflect a preference for a different terminology. *See, e.g., Howard v. Berryhill*, No. 3:16-CV-318-BN, 2017 U.S. Dist. LEXIS 19008, 2017 WL 551666, at *7 (N.D. Tex. Feb. 10, 2017) ("having reviewed the old and new rulings, it is evident that the change brought about by SSR 16-3p was mostly semantic."). While the court applies the current SSR, it declines to engage in verbal gymnastics to avoid the term "credibility" where usage of that term is most logical.

March 22, 2022, the claimant shared that she is family focused. She would like to learn how to be certified as a home health aide inside a desire to take care of her mother, something that she is already doing daily (B26F/22). There are many reports of the claimant being so busy caring for others that she has no time for herself (B26F).

The claimant reported that she was tired of feeling depressed and anxious and wants to decrease symptoms and increase her self-esteem. She wants to be more social and meet and make new friends (B14F/7). Her counseling notes reflect treatment for generalized anxiety disorder in the sense that claimant wants to overcome her social anxiety, meet a new best friend, find a boyfriend, attend more socially diverse events and attend events "on my own" versus "my mother always going along" (B27F/3). She was making progress on her goals and notes indicate plans to titrate her sessions to biweekly and then to as needed only (B27F/1-3). The claimant reported meeting her favorite author at a book signing at her 4/11/23 session. The claimant was researching events to attend so as to work toward her personal goals (Id. at 12). The claimant had been writing her pen pals, reading a lot, and was in the process of writing a book. She set a goal for herself to get a job at the library due to her love books, literature, authors and films. She mentioned that the library is nearby and walkable (Id. at 43). The claimant was getting up the nerve to ask her author acquaintance out for coffee and to see a movie (9/5/23, B27F/49). The claimant attended CPR recertification, which was a work requirement on 5/4/22. There are references to spending time with family (B27F/51-52).

Earlier counseling notes reflect the claimant's reports that she can be shy (B26F/51). The claimant did have some compliance issues with doing homework, saying that she was too busy with her brother and mother to complete it at her June 7, 2022 session (B26F/45). As noted, the claimant made progress and was told she could reduce the frequency of her sessions, but she continued every week or every other for the most part (B26F, B27F). She was forthcoming about symptoms and progressed in her goals (Id.)

There is not a lot of objective evidence in counseling records such as regular mental status exam findings. However, the narrative in her counseling notes reveals that the claimant no longer wanted to be limited by the shyness she described. She had specific goals. Progress is documented. Looking at other evidence in the record, notes from the claimant's 2/6/23 primary care visit reflect normal behavioral, thought content and judgment (B22F/5). The claimant was not nervous or anxious on May 12, 2022 (B22F/10). She had documented normal mood, affect, behavior, judgment and thought content on 2/19/21 (B11F/7). The claimant's recent job change from caring for patients and lifting fifty pounds (B23F/39) to working in a public library is in line with her stated desire to work in a field she loves. Her counseling notes confirm that the claimant wants more social interaction and more social activities rather than wants to avoid

others. She has maintained her library job since her hire date in March 2023 and had successfully worked caring for patients from her alleged onset date up to her new job. There is no evidence of significant difficulty getting along with supervisors or co-workers. Giving her the benefit of the doubt, she has been provided a limitation to only occasional superficial contact with the public throughout the period of alleged disability despite the fact that more recent records suggests that she is moving toward frequent contact with the public. In light of her mental symptoms viewed in combination, she has also been limited to simple instructions and directions in a static work environment. This, along with the reduced public contact, will provide a lower stress environment in light of moderate limits in adapting or managing oneself.

Understanding, remembering, applying information and concentration, persistence or pace limitations are not supported by the records with intact findings where noted. She is able to maintain two successful part-time jobs. The claimant denied taking care of anyone else (other than her cat), in her function report dated March 12, 2022 (B5E), but she tells providers that she takes care of her mother. On March 22, 2022, the claimant shared that she is family focused. She would like to learn how to be certified as a home health aide inside a desire to take care of her mother, something that she is already doing daily (B26F/22). The fact that she provides care on a daily basis to her mother, and later to other family members, may suggest reasons other than disability for her not working a full-time job. She had been working full-time and reduced her hours to part-time. She was hired by the County of Richland to work at DaySprings where she cared for patients. She testified that she cleaned their rooms and assisting them in showering and eating meals. She said that she lifted fifty pounds doing this job (8:34:00 – 8:36) (B8D). Thus, the claimant was working a part-time medium exertional level job successfully and caring for her mother while alleging an inability to work due to pain and mental symptoms.

The claimant changed jobs from a STNA/health aide to a library job. She testified that she does work eight hour shifts and four hour shifts. While she alleges in her function report that she has gone out less and less due to pains and mental issues (4/12/22, B5E/8), the claimant reported that she wants to become more social, meet and make new friends on 4/19/22 (B26F/28). This was just a week after her function report. She also reported that she is hoping to be her mother's home aid and possibly work part-time at the library (B26F/28). On June 7, 2022, the claimant reported that she was too busy with her mom and ill brother to do her homework (Id. at 45). She had complained of being too busy on many occasions and was told to take time for her own self-care instead of spending all her time caring for others (Id. at 45). There is a report on May 4, 2022, that the claimant spent time sharing stressors and concerns for her mother, father, and brother's health issues as well as some of her clients at work (County of Richland, Daysprings, without names shared (B26F/32). Staff discussed the importance of self-care and told the claimant to increase the time of self-care compared to the

time spent on caring for others (B26F). She was working one-on-one with patients. Complaints about working with clients, co-workers or supervisors are not documented in treatment records. Thus, no additional social interaction limitations are supported. Notes reveal that the claimant was very busy caring for mother, other family members, and her clients and was making progress in her work on improving self-esteem and increasing social events. No limits were suggested (B20F). The adapting and managing oneself limitations are fully covered by the residual functional capacity limitations that will reduce stress by limiting the complexity of her work and changes in the work setting and by limiting social interaction to some extent. She has admitted to progress in interactions with others. No other limitations can be supported by the entirety of the record.

The claimant did have a psychological evaluation on September 6, 2022 which documented intact mental status exam findings and an opinion that the claimant had no significant limitations in any of the paragraph B criteria. While this supports the mild findings in this decision, counseling notes do support the moderate limitation in the two criteria indicated. Thus, unlike the state agency and the psychological examiner's opinion, severe mental impairments are found supported by the treatment records. The psychological examination was a one day evaluation and is inconsistent with deficits supported by ongoing treatment records. Therefore, the nonsevere findings of the state agency and the psychological examiner's opinion evidence are unpersuasive (B20F).

**While the claimant alleges significant physical symptoms and limitations, the previously discussed evidence suggests that she is capable of physical activities involved in caring for her mother, brother and clients, with so much responsibility and time involved, that she was not doing required homework.** She did attend appointments regularly, engaged in discussions openly and made progress toward her goals. Notably, the claimant worked part-time caring for patients including assisting them with showers and meals and cleaning their rooms (County of Richland). She testified that she lifted fifty pounds doing this work. She was hired in 2019 and worked through the end of 2022. She did not describe difficulties performing this job despite the medium exertional level required. She does complain of pain and other symptoms in general. Notably she left this job for another not due to difficulty performing this job but because of a great interest in literature and a desire to work at a library. She makes friends with an author whose talk she attended as noted in counseling records.

Neurology notes from May 23, 2023 provide evidence about her physical impairments (B29F). She has been diagnosed with neurofibromatosis 1 and a stable right optic glioma, extra axial planum sphenoidale mass, and a intrathecal extra medullary enhancing nodule at the L3 level. She reported no vision changes but the specialist indicated that she will need close follow-up given proximity of the extra axial lesion to the optic nerve and chronic loss of vision in right eye.

The neurologist wrote that the claimant is clinically stable with no new focal neurological symptoms and that the magnetic resonance imaging results showed no new or progressive lesions reviewed with the patient. The claimant was to continue clinical and radiological follow-up and a repeat magnetic resonance imaging of the brain and lumbar spine was requested in one year. Vision limits are needed given that the claimant has no vision in her right eye (no light or movement seen on testing). Thus, she has been limited to jobs with no requirement for binocular vision in order to perform work activities. Her vision impairment also supports the need for climbing and hazard limitations which were included in the residual functional capacity.

The claimant reported doing well with headaches only every few months rated as a 5 on a 10 point pain scale and controlled with ibuprofen. She reported intermittent left knee pain but this was normal on a recent magnetic resonance imaging. She reported intermittent pain in the left lateral thigh with last episode a few weeks ago. She denied radicular pain, weakness, numbness, bowel/bladder dysfunction, saddle anesthesia, neck pain, and other focal neurological symptoms. Objective findings at this neurology visit included intact visual field on left, with no light or movement perception in the right eye. She had multiple cutaneous neurofibromas (not cancerous) and tenderness on palpation of bilateral paraspinal lumbar area. Other findings were intact including full strength through the extremities and no sensory deficits to light touch. She had normal bulk and muscle tone. Her straight leg raise tests were all negative. She had no pain or step-off at palpation of the midline cervical, thoracic or lumbar spines. She had intact respiratory, abdominal, neck, deep tendon reflexes, and no Hoffman, clonus, or Babinski. As noted, her brain magnetic resonance imaging supported stability (B29F/7-9). The record in its entirety does not support a severe headache disorder with consideration of SSR 19-4p. The claimant has moderate symptoms only every few months and the headaches respond to ibuprofen. Spinal findings are mild or normal with some tenderness in the lumbar spine only. Consideration was made of the findings and the magnetic resonance imaging findings regarding the lumbar spine in reducing the claimant to light exertional level work in a setting where she was performing medium exertional level work on a part-time basis to avoid aggravation of her impairments and reduce the pain described.

As far as her physical impairments, the claimant's treatment history had some significant gaps and compliance issues, which suggests less bothersome symptoms than alleged in disability reports. One visit reflected a diagnosis of endometriosis with reported pelvic pain symptoms in the right and left lower quadrants and midline with pain doubling her over (12/12/19, 9B, 5F/4). **However, she admitted to missing pills prior to the episodes. One laparoscopy was negative for endometriosis** (B5F). **Treatment was initiated at this Cleveland Clinic visit, but the claimant did not return for follow-up** (B5F, B20F). Pelvic floor physical therapy was ordered 12/27/19 (B4F/19). She had denied fatigue, abdominal pain, mental health and urinary incontinence but

8

reported pelvic pain. She had some tenderness without rigidity, rebound or guarding (Id. at 18). **For another example of compliance issues, on February 19, 2021, the claimant reported that she had been on amitriptyline and Flexeril given to her at OSU, but never followed up and ran out of medications.** She complained of pelvic pain for the past two weeks. She was sent for a pelvic ultrasound and told to keep this appointment. She was provided updated prescriptions (B11F/8). **After a six month gap, the claimant returned on 8/25/21**. It was noted that she had laparoscopic surgery and a dilation and curettage procedure, but there was no definitive diagnosis to justify her pelvic pain according to the doctor (B11F/11, B9F). She complained only of abdominal pain, constipation, nausea and pelvic pain (Id.). The claimant treated with Dr. Chung at Mansfield obstetrics and gynecology associates with the claimant reporting pain in the pelvic area without radiation. The doctor noted that the claimant's ultrasound on 10/21/21 was normal except for cysts (B16F/14). Her colonoscopy had been normal (Id. at 14). The June 2021 endometrium biopsy and the endometrial polyps' biopsy were benign. The claimant's June 16, 2021 hysteroscopy revealed a thickened endometrium and three small polyps testing (B9F/11).

In late 2021, she was referred to gastroenterology by her primary care physician for her complaints of chronic lower abdominal and pelvic pain (B10F, B12F). Her work-up did not uncover a definite diagnosis with many negative findings. The assessment noted chronic nausea and lower abdominal/pelvic pain. It was noted that other extensive workups by OB/GYN were not definitive. Her symptoms "may be related to neuro fibromatosis type I." Her magnetic resonance imaging of the lumbar spine on 9/17/2021 was reviewed. Her esophagogastroduodenoscopy and colonoscopy ruled out any gastroenterology etiology that may be causing her chronic abdominal pain and nausea (Id.). Overall, the various workups did not establish a definite diagnosis with pelvic pain listed in the assessment (B8F/29) but she had been diagnosed with neuro fibromatosis at earlier visits. A new impairment of chronic abdominal and pelvic pain of unknown etiology was considered in this decision.

The claimant was seen by Dr. Chung on May 18, 2023 and reported that her treatment did not resolve her pelvic pain. The claimant reported regular exercise. Notably, she denied all symptoms other than pelvic pain. She was alert and in no acute distress and she demonstrated a normal mood, appropriate affect, and normal orientation. She had a normal gait and coordination, and denied symptoms from other systems. The claimant's gynecological exam was without abnormal findings and reports of pelvic pain only. She was seen on 6/10/22 then on 5/18/23 where she again mentioned complaints of pain in the setting of essentially intact physical findings. She had normal coordination and a normal gait and a normal mood and affect (B25F/19).

Overall, the claimant has had workups from specialist who do not all agree on the

9

source of the pain which by the claimant's own reports ranges from mild to debilitating. However, pain exacerbations needing treatment are rare. **There are some gaps and compliance issues which may suggest less bothersome symptoms than alleged in disability reports.** Overall, while the claimant does have severe impairments, the extent of limitation she alleges is not consistent with her considerable activities of daily living with a part-time job performed at medium, another job performed at light, and off work duties consisting of taking care of many people, to the extent that the claimant continually reports that she is too busy to complete her counseling homework. She is able to exercise as noted. Her physical findings on exam, testing and imaging do not support the extent of limitations she has alleged. Therefore, while her pain complaints, which largely focus on pelvic pain, and sometimes lower abdominal pain, are well documented in the record, there is no evidence that rules out light exertional level work with vision, climbing and hazard limitations as specified in the residual functional capacity. She cites to back pain but complaints are not continuously documented in the record and physical findings are normal to mild overall. There is no objective evidence in the record that warrants the inclusion of limitations involving her back beyond a reduction to light work. Her lumbar spine magnetic resonance imaging on 5/23/23 revealed stability and her exam findings reveal intact spinal and extremity findings (B29F). Complaints regarding back pain are found early in the record during a time she was lifting up to fifty pounds. The lumbar magnetic resonance imaging revealed unchanged lesions favoring neurofibroma were considered in the setting of very mild to normal findings with regard to her spine (B29F/30). Given her symptoms, treatment history and reports, she has been reduced to light work to avoid aggravating her impairments. Pain was considered in adding no ladders, ropes, and scaffolds and hazard limitations. Vision limitations are supported given no vision in one eye.

(Tr. 23-28) (emphasis added).

The Court includes the entirety of the ALJ's credibility analysis for several reasons. First, to illustrate the depth and thoroughness of the ALJ's decision on this issue. Second, the Court considers the decision as a whole—and the credibility analysis as a whole—rather than as merely the sum of its parts. The Plaintiff's credibility was clearly based on the consideration of the entire picture of Plaintiff's healthcare, coupled with her testimony, and daily activities, and not one singular piece of the puzzle. Under the facts of this case, focusing on one single aspect of the

10

decision—and arguing it renders the entire determination subject to remand—lacks merit.[2]

Plaintiff takes issues with rather minor portions of the ALJ's credibility analysis. Plaintiff challenges the ALJ's statement that "a six month gap" in treatment from February 19, 2021 to August 25, 2021 occurred, which was used to discredit Plaintiff. (R. 14, PageID# 1236, citing Tr. 26). Plaintiff protests that she sought additional care and underwent a surgical procedure during this time period and also that she allegedly "could not get into her prescribing sources …." *Id*. The R&R found "no error meriting a remand in the ALJ's discussion of noncompliance or treatment gaps." (R. 13, PageID# 1222). The R&R continued as follows:

> As an initial matter, the ALJ did not rely extensively on a finding of noncompliance; at most, she concluded that "some gaps and compliance issues ... *may suggest* less bothersome symptoms than alleged in disability reports." (Tr. 27) (emphasis added). Reading the decision as a whole, it is clear that the ALJ was most convinced by the lack of a determinable etiology for the pain despite numerous tests, the consistently unremarkable physical examinations even at appointments where Ms. Conrad was complaining of debilitating pain, and the fact that Ms. Conrad was able to work part-time jobs while caring extensively for her mother and brother and engaging in reading hobbies.
>
> Moreover, I do not view the ALJ's findings of "some treatment gaps and compliance issues" as materially inaccurate or misleading. Ms. Conrad admits to missing oral contraceptives on one occasion. While it is true that she did not report that the medication alleviated her pain, it must be also acknowledged that her doctors specifically prescribed the medication to treat the possible endometriosis and to try to mitigate the pelvic pain, which tended to be aggravated during menses. (See, e.g., Tr. 461.) In other words, the medication was not, as Ms. Conrad seems to suggest, irrelevant to her treatment; it was a core part of her doctors' treatment plan. Ms. Conrad also does not seem to contest that she ran out of muscle relaxant between September 2020 and February 2021 and did not follow up with Ms. Bowman or Dr. Santayana's practice for a refill, even though she felt that the muscle relaxant had helped her pain. (Tr. 608.) Ms. Conrad also discontinued pelvic floor physical therapy, which had been recommended. (See Tr. 484; 486.)

---

[2] The Court does not foreclose the possibility that there could be a case where a single, gross misstatement of the record could conceivably cause the ALJ's entire analysis to run afoul of SSR 16-3p. This, however, is not such a case.

> Although it must be noted that these compliance gaps occurred between late 2019 and early 2021, a period that included the early COVID pandemic, I cannot say that the ALJ erred or mischaracterized the record by stating that these gaps "may suggest" less bothersome symptoms than alleged.

(R. 13, PageID# 1222-23). The Court wholly agrees with the above analysis in the R&R and adopts it as its own.

The remainder of Plaintiff's objections generally ask the Court to reweigh the evidence, and essentially come to its own, contrary credibility determination. For example, she argues that "the record shows ongoing symptoms when Plaintiff was compliant with treatment," that the treatment she allegedly did not comply with was ineffective, and argues that "the record contains objective medical evidence substantiating Plaintiff's statements." (R. 14, PageID# 1239-40, 1242). In other words, despite her framing of the issue, Plaintiff is not actually asserting any failure by the ALJ to comply with SSR 16-3p, but rather she is advocating for a different result based on her own characterization of the evidence. Plaintiff is seeking to downplay the evidence on which the ALJ relied, and to refocus the Court's attention on evidence she believes supports her desired outcome.

Such arguments are perfectly appropriate to make before the ALJ. However, a court's review, when considering a social security appeal, does *not* include reviewing all the evidence *de novo*, reweighing the evidence, **or making credibility determinations**. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989) (emphasis added); *Nelson v. Comm'r of Soc. Sec.*, 195 Fed. App'x 462, 468 (6th Cir. 2006); *Hunter v. Comm'r of Soc. Sec.*, No. 3:19 CV 1977, 2021 WL 32116, at *3, 2021 U.S. Dist. LEXIS 1112, at *6-7 (N.D. Ohio Jan. 5, 2021) ("it is well settled that this Court cannot and will not re-weigh evidence; in these cases, the Court exists solely to determine whether the ALJ's findings, on initial review, are supported by

12

substantial evidence.") (Knepp, J.) (*citing Wright v. Massanari*, 321 F.3d 611, 614-15 (6th Cir. 2003)); *Stief v. Comm'r of Soc. Sec.*, No. 16-11923, 2017 WL 4973225, at *11 (E.D. Mich. May 23, 2017) ("Arguments which in actuality require 're-weigh[ing] record evidence' beseech district courts to perform a forbidden ritual."), *report and recommendation adopted*, 2017 WL 3976617 (E.D. Mich. Sept. 11, 2017). "When deciding under 42 U.S.C. § 405(g) whether substantial evidence supports the ALJ's decision, we do not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility." *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 713 (6th Cir. 2012) (*quoting Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007)).

Therefore, the Court takes no issue with the R&R's resolution of the first assignment of error, and adopts the well-reasoned opinion.

### III. Conclusion

The Court has carefully reviewed the Report and Recommendation, according to the above-referenced standard, as well as the ALJ's decision, and Plaintiff's objections. The Court agrees with the Magistrate Judge's resolution of the issues raised. Therefore, the Magistrate Judge's Report and Recommendation (R. 13) is hereby Adopted, Plaintiff's objections are Overruled (R. 14), and the Commissioner's decision is hereby Affirmed.

IT IS SO ORDERED.

March 12, 2026                           *David A. Ruiz*
                                         David A. Ruiz
                                         United States District Judge